**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 03 CV 8220** |
| **v.** | ) | |
| **FUNDS IN THE AMOUNT OF $40,000,** | ) | **JUDGE DAVID H. COAR** |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On May 20, 2003, law enforcement officials seized $40,000 in cash from James Simonds ("Simonds"), who was stopped in Chicago while traveling from New York City to Lamy, New Mexico via Amtrak. The Government then instituted a forfeiture proceeding pursuant to 21 U.S.C. § 881(a)(6). On February 28, 2006, the Government filed a motion for summary judgment, arguing that the defendant funds should be forfeited because of the clear evidence that the funds were either proceeds of narcotics trafficking, or were intended to be used for the purchase of illegal narcotics. On the same date, James Simonds and Stephen M. Komie (collectively "Claimants") moved to suppress and quash the $40,000 seized from Simonds. On April 26, 2007, the Court held a suppression hearing on Claimants' motion. Presently before the Court are Plaintiff's motion for summary judgment and Claimants' motion to suppress. In resolving these motions, the Court has considered both the briefing in this case and testimony at the suppression hearing. For the reasons set forth below, Claimants' motion to suppress is DENIED, and the Government's motion for summary judgment is GRANTED.

# I.    Factual Background

On the morning of May 20, 2003, a confidential source informed Chicago Police Officer Darrell Johnson that James Simonds had purchased a one-way Amtrak ticket leaving New York, New York on that same day and destined for Lamy, New Mexico via Chicago, Illinois.  (Plaintiff's Rule 56.1 Statement of Material Facts ("PSOF") ¶ 21.)  Although Simonds had purchased his ticket on May 19, 2003, the Chicago Police Department first became aware of Simonds's travel on the morning of May 20, 2003.  (*Id.* at ¶¶ 21-22.)  Once Officer Johnson was notified by the confidential source, he informed Drug Enforcement Administration ("DEA") Special Agent Thomas Evans ("Evans") of Simonds's travel plans around 9:00 or 9:15 a.m. on the morning of May 20, 2003.  (Suppress. Hr'g Tr. 7-8, 12, Apr. 26, 2007.)  Agent Evans then relayed his knowledge of Simonds's travel plans to Chicago Police Detective Eric Romano ("Romano").  (*Id.* at 66.)

The Chicago Police Department was notified of Simonds's travel plans because his plans fit the recognized profile of a drug courier in several respects: (1) he had purchased a one-way ticket, (2) on short notice, (3) for first-class accommodations, and (4) he was departing from New York City, a known "source city" for narcotics.  (Tr. 9, 54-55; PSOF ¶¶ 23-24.)  Because these characteristics often indicate a traveler's involvement in drug trafficking, Agent Evans grew suspicious and called the DEA, requesting information on James Simonds from the North American Dangerous Drug Information System ("NADDIS").  (*Id.* at ¶ 25.)  The NADDIS database contains information on persons who are involved in DEA investigations.  (*Id.*)  A DEA employee performed the NADDIS search requested by Agent Evans and reported that his search revealed the following information about James Martin Simonds, a California resident whose date of birth is November 24, 1931:

(a) In March 2001 and May 2001, it was reported to the DEA that Simonds was a poly drug trafficker in California;

(b) In January 2001, agents checking NADDIS were to be on the lookout for Simonds because he was possibly going to smuggle LSD or MDMA into California in his luggage;

(c) In June 2000 and November 2000, Simonds was reported to be the source of 1.5 kilograms of LSD seized in California;

(d) In February 2000 and July 2000, Simonds was reported to be involved in manufacturing and distributing LSD; and

(e) In the summer of 1986, $70,000 was seized from Simonds in Denver, Colorado.

(*Id.* at ¶ 26.)  Agent Evans relayed the results of this search to Detective Romano, and based on both this information and Simonds's suspicious travel arrangements, the officers decided to approach and question Simonds while his train was stopped in Chicago.  (*Id.* at ¶ 27.)

At approximately 3:00 p.m. on May 20, 2003, Agent Evans and Detective Romano boarded the Amtrak train and located Simonds's sleeper car.  (*Id.* at ¶ 28.)  Simonds was standing in the doorway when Evans and Romano approached his compartment, identified themselves, and produced their credentials.  (Tr. 15, 19-20, 69, 108.)  According to both Evans and Romano, Evans then informed Simonds that they wanted to speak with him, he was not required to speak with them, and he was not under arrest.  (*Id.* at 20, 71.)  At Agent Evans's request, Simonds produced his California driver's license and train ticket.  (PSOF ¶ 30.)  Evans confirmed that the birth date on Simonds's license matched the birth date in the NADDIS database, indicating that Simonds was the same person whose history of investigation for narcotics trafficking had surfaced in the DEA search.  (*Id.* at ¶ 31.)  When Agent Evans then inquired as to the purpose of Simonds's travel, Simonds responded that he was on his way home.  (*Id.* at ¶ 31; Tr. 72, 108-09.)  Simonds's claim that he was traveling "home" further raised the officers' suspicions since Simonds was traveling to New Mexico and was a resident of

California. (PSOF ¶ 32.) At that point, Agent Evans began to ask Simonds questions about his baggage. Evans asked if Simonds's baggage was his, and he said yes. (Tr. 23, 109.) Evans asked if Simonds had packed his bags himself, and he also answered affirmatively. (Tr. 23.) In response to Evans's further questioning, Simonds stated that his baggage did not contain drugs, large amounts of currency, or weapons of any sort. (Tr. 24-25.)

As Agent Evans and Detective Romano questioned Simonds, they observed several examples of "nervous behavior." (*Id.* at 25.) Agent Evans observed that when he initially produced his credentials, Simonds "swallowed like he was swallowing poison." (*Id.*; PSOF ¶ 34.) According to Agent Evans, Simonds's hands were trembling when he handed Evans his train ticket and identification, and during the course of their exchange, Simonds fidgeted with his hands and avoided eye contact. (Tr. 25.) Evans found Simonds's behavior particularly significant because, in his experience, people often appear nervous when he first approaches them, but those who are not carrying contraband normally calm down as the officers' questions continue. (*Id.* at 57.) Instead, Simonds continued to appear nervous throughout his exchange with the officers. (*Id.*) As the officers proceeded to question Simonds, Detective Romano noted that Simonds appeared "extremely nervous;" he was swaying back and forth and putting one of his hands in and out of his pocket. (*Id.* at 73.) Concerned that Simonds might have a weapon in his pocket, Romano asked if he could check Simonds's pocket. (PSOF ¶ 47.) Simonds complied, and after crushing Simonds's pockets with his hands, Detective Romano was satisfied that Simonds was not carrying a weapon. (Tr. 74.)

As the conversation between Simonds and the officers progressed, Simonds began to equivocate in response to the officers' repeated questions about the contents of his baggage. In an effort to calm Simonds down, Detective Romano advised him that the officers were not

concerned with small quantities of marijuana (e.g., a joint) if that was what he was hiding.  (Tr. 47, 74-75.)  Agent Evans asked Simonds again if he was carrying any weapons, drugs, or large amounts of U.S. currency, and Simonds indicated that he might be.  (Tr. 34, 47, 75.)  His exact response is unclear; Detective Romano testified that Simonds simply did not answer Agent Evans's inquiry, while Agent Evans testified that Simonds stated that he had something to hide.  (*Id.*)  In any case, based on Simonds's suspicious answers to the officers' questions, his nervous behavior, the information in the NADDIS database, and Simonds's travel arrangements, Agent Evans decided to seize Simonds's luggage and subject it to a dog sniff for narcotics.  (PSOF ¶ 43; Tr. 27.)  Evans informed Simonds that he planned to take his luggage off the train for a dog sniff in the Amtrak police office and that Simonds was free to continue on his way or accompany his luggage.  (Tr. 27-29.)

Before removing Simonds's three bags from the train, Agent Evans asked him for permission to search the luggage.  (*Id.* at 30.)  Simonds responded that two of his bags were locked, and Evans asked if he could search the third bag, an unlocked gym bag.  (*Id.* at 30-31.)  According to Agent Evans, Simonds mumbled, in a hushed tone, "no, I don't think so."  (*Id.*)  Both Agent Evans and Detective Romano testified that, after some additional conversation, Simonds eventually offered them permission to search his gym bag.  (*Id.* at 38-40, 80.)  Simonds insists that he gave no such consent.  (*Id.* at 110.)  When Agent Evans unzipped Simonds's gym bag, he found 12 pounds of marijuana in plastic bags.  (*Id.* at 40; PSOF ¶¶ 44-45.)  The officers then placed Simonds under arrest and escorted him to the Amtrak interdiction office in handcuffs.  (*Id.* at ¶ 46.)

After Simonds was arrested, an Amtrak officer called the Chicago Police Department to request that a drug-detecting canine come to the station to sniff Simonds's luggage.  (*Id.* at ¶ 49.)

Chicago Police Officer Thomas O'Boyle arrived shortly thereafter with his German Shepard, Britt, a dog trained to detect the presence of narcotics, including marijuana. (*Id.* at ¶ 50.) When Officer O'Boyle commanded Britt to sniff Simonds's luggage, Britt put his nose into Simonds's attaché case, backed off, and sat down, indicating that he detected the scent of narcotics. (*Id.* at ¶ 51.) After Britt was permitted to stand up, he walked over to a piece of Simonds's luggage that had previously contained marijuana and sat down in the bag, indicating that he detected narcotics in that bag as well. (*Id.* at ¶ 54.) After the positive dog sniff, the officers opened the attaché case and found $40,000 of U.S. currency in eight bundles. (Tr. 52.) When Agent Evans asked Simonds if the money and marijuana belonged to him, he replied that they did not. (*Id.* at 53, 54.)

After disclaiming ownership of the funds the day they were seized, Simonds asserted his Fifth Amendment right against self-incrimination throughout discovery and refused to answer questions about the source and ownership of the $40,000. (*Id.* at 113-14; PSOF ¶ 38.) For the first time during this proceeding, at his suppression hearing, Simonds claimed ownership of both the marijuana and the $40,000. (*Id.* at 114-15.) Simonds testified specifically that the $40,000 was a gift from his mother intended for him and his two sons. (*Id.* at 116.) He explained that his mother, who is now deceased, drove from St. Louis to Chicago to give him the money when his New Mexico-bound train was temporarily stopped in Chicago. (*Id.*) When asked why he had previously refused to answer any questions about the source of the $40,000, Simonds responded, "I thought it would be hard to explain." (*Id.*) When pressed further, he stated that he did not think the source of the money would be believed. (*Id.* at 120.) The Court finds Simonds's explanation incredible. It simply defies reason to believe that Simonds would not have explained the source of the funds earlier in this proceeding if he had, in fact, obtained them lawfully.

Moreover, Simonds's story neither explains nor comports with the other suspicious aspects of his travel plans—specifically, that he purchased his ticket on short notice and claimed to be traveling "home" to New Mexico despite his residency in California.

Simonds's financial situation as of May 20, 2003 is particularly relevant to the Court's consideration of the Government's motion for summary judgment. From the mid-1990s to October 2003, Simonds earned his primary source of income as a massage therapist. (PSOF ¶ 12.) In addition, in 2003, he also worked as a marketing representative. (*Id.* at ¶ 16.) In each of the 10 years Simonds worked as a massage therapist, he earned approximately $20,000 per year. (*Id.* at ¶15.) In the tax year ending 2002, Simonds's adjusted gross income was $11,805. (*Id.* at ¶ 13.) In the tax year ending 2003, Simonds's adjusted gross income was $9,059. (*Id.* at ¶ 14.) In 2003, Simonds did not own real estate, but he had significant expenses, including $2,200 per month in rent and living expenses for himself and his two sons. (*Id.* at ¶¶ 18-19.) In May 2003, Simonds had approximately $25,000 in life savings, which he kept in his apartment. (*Id.* at ¶ 20.) At that time, he had no bank accounts or safe deposit boxes containing any other assets. (*Id.*)

After seizing the defendant funds, the Government instituted a forfeiture proceeding pursuant to 21 U.S.C. § 881(a)(6), alleging that the defendant funds "were furnished or intended to be furnished . . . in exchange for a controlled substance." § 881(a)(6). On February 28, 2006, the Government filed a motion for summary judgment, and Claimants, James Simonds and Stephen M. Komie,[1] moved to suppress and quash the $40,000 seized from Simonds. Both motions are currently before the Court.

---

[1] Komie's claim to the defendant funds is based on an assignment for $20,000. (PSOF ¶ 8.)

## II.    Analysis

### a.    Motion to Suppress

The Court first considers Claimants' motion to suppress the $40,000 that they argue was found in Simonds's possession as a result of an unlawful search and seizure. The Fourth Amendment permits limited, investigative seizures of luggage "on the basis of reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime." *United States v. Place*, 462 U.S. 696, 702 (1983) (applying the principles of *Terry v. Ohio*, 392 U.S. 1 (1968), to permit such seizures). Accordingly, to determine whether the officers violated Simonds's Fourth Amendment rights, the Court must evaluate whether they had "reasonable suspicion" to detain Simonds's bags and subject them to a dog sniff. *See id.* Reasonable suspicion cannot derive solely from the officers' conclusion that Simonds fit the profile of a drug courier. *See United States v. Marrocco*, 578 F.3d 627, 632 (7th Cir. 2009); *United States v. Sterling*, 909 F.2d 1078, 1083 (7th Cir. 1990) (citing *Reid v. Georgia*, 448 U.S. 438, 440-41 (1980) (per curiam)). Instead, such suspicion "must be based on specific, articulable facts which, judged in light of the officers' experience would justify the intrusion." *Marrocco*, 578 F.3d at 633 (citing *United States v. Yang*, 286 F.3d 940, 949 (7th Cir. 2002)).

The Court evaluates the officers' "conduct at each stage in the investigation, viewing their actions in light of the totality of the circumstances." *Id.* at 632. When assessing the "totality of the circumstances," the Court may consider the officers' experience and knowledge, the typical characteristics of individuals involved in illegal activities, and the suspect's behavior. *Sterling*, 909 F.2d at 1083-84 (citing *United States v. $73,277, United States Currency*, 710 F.2d 283, 290 (7th Cir. 1983)). The inquiry does not end upon determining that reasonable suspicion exists. As the Seventh Circuit recently recognized, "even when an officer has reasonable

suspicion, his ability to detain a suspect's baggage is limited: Any such detention must be reasonable in time and scope given the totality of the circumstances surrounding the investigatory act." *Marrocco*, 578 F.3d at 633; *see also Sterling*, 909 F.3d at 1085.

In *United States v. Marrocco*, the Seventh Circuit recently addressed facts strikingly similar to those in this case. The court's resolution in that case is therefore instructive. In *Marrocco*, Amtrak law enforcement officials (including Detective Romano, who is also involved in the instant case) discovered that the claimant's purchase of a one-way train ticket with cash, on short notice, indicated that he fit the profile of a drug courier. *Marrocco*, 578 F.3d at 633. Although the claimant's profile prompted the officers to question him, it did not alone provide the officers with reasonable suspicion to seize or search his luggage. *Id.* Rather, the officers approached the claimant's sleeping car minutes before the train's scheduled departure, and the events that transpired during their interaction with the claimant afforded the officers reasonable suspicion to detain his luggage. *Id.* Summarizing the facts that enabled the officers to form such suspicion, the court noted that the claimant began sweating when the officers asked him whether he was carrying weapons, drugs, or large sums of money, and he "gave conflicting responses when questioned about the briefcase's contents." *Id.* Specifically, he initially told the officers that he was not carrying a large sum of money, but later admitted that his briefcase contained $50,000 in cash. *Id.* Ultimately, the court concluded that the officers developed reasonable suspicion that the claimant's briefcase contained contraband due to the claimant's "demeanor and responses," the circumstances surrounding his ticket purchase, the officers' experience and knowledge, and their awareness of the recognized characteristics of a drug courier. *Id.* at 633-34.

As in *Marrocco*, Agent Evans and Detective Romano approached Simonds because his travel arrangements indicated that he fit the profile of a drug courier; Simonds had purchased a one-way ticket for first-class accommodations on short notice, and he was departing from a recognized "source city" for narcotics. Despite this information, the officers did not form reasonable suspicion to detain Simonds's luggage until they questioned him aboard the train. When interacting with Simonds, the officers perceived that he was behaving nervously. They observed that Simonds "swallowed like he was swallowing poison" when Agent Evans initially produced his credentials (PSOF ¶ 34), Simonds's hands trembled when he handed the officers his identification and train ticket (Tr. 25), and throughout the exchange, he continuously fidgeted and avoided making eye contact with the officers. (*Id.*) Agent Evans noted, in particular, that while individuals who are not carrying contraband normally calm down during the course of questioning, Simonds continued to appear nervous throughout his exchange with the officers. (*Id.* at 57.)

In addition to Simonds's apparent nervousness, he offered suspicious responses to the officers' questions. At the outset of the officers' questioning, Simonds told them that he was returning "home" to New Mexico, even though he was a California resident. (PSOF ¶¶ 31-32; Tr. 72, 108-09.) Simonds also provided conflicting answers to the officers' inquiries as to the contents of his luggage. At first, he denied that he was carrying any weapons, drugs, or large amounts of U.S. currency. (Tr. 24-25.) However, Simonds later equivocated in response to the same questions. The officers differ in their accounts of Simonds's exact response when they asked about the contents of his luggage a second time; while Detective Romano testified that Simonds simply did not answer their questions, Agent Evans testified that Simonds expressed that he had something to hide. (Tr. 34, 47, 75.) Although the officers' precise renditions of this

portion of the conversation differ, they both indicate that Simonds retreated from his initial denial that he was carrying contraband, and his demeanor increased their suspicion that he was, in fact, carrying contraband. (*Id.*)

As in *Marrocco*, the officers here "were permitted to consider [the claimant's] responses and mannerisms, the circumstances surrounding his ticket purchase, their own experience and knowledge, and 'the characteristics of persons engaged in illegal activities,' when determining whether the briefcase was likely to contain contraband." *Marrocco*, 578 F.3d 634 (quoting *Sterling,* 909 F.2d at 1083-84). In forming reasonable suspicion, Agent Evans and Detective Romano permissibly evaluated Simonds's demeanor and responses to their questions—both Simonds's claim that he was returning "home" to New Mexico despite his California residency, and his equivocation in response to questions about the contents of his luggage. Simonds's nervous behavior and his responses to the officers' questions "carried the suspicion that had been aroused by his fitting the drug profile over the line that separates bare suspicion from reasonable suspicion." *Goodwin*, 449 F.3d at 768-69 (finding that "[t]he combination of fitting the drug profile and giving a suspicious answer to the question about looking inside his luggage created a reasonable suspicion that the defendant's luggage contained contraband"); *see also Sterling*, 909 F.2d at 1084 (police officers had reasonable suspicion to detain the defendant's luggage because she told an "improbable story" and "the officers appropriately assessed . . . that her answers were an effort to conceal the truth").

The Court's Fourth Amendment inquiry does not end upon finding that the officers had reasonable suspicion to detain Simonds's luggage. The officers' detention of Simonds's bags must also have been reasonable under the circumstances. *See Marrocco*, 578 F.3d at 634. To determine the reasonableness of a seizure, the Court must "balance the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the importance of the Governmental interests alleged to justify the intrusion." *Place*, 462 U.S. at 703; *Marrocco*, 578 F.3d at 634. In conducting this analysis, the Court considers many factors concerning both the intrusion on the individual's interests and the countervailing Governmental interests. *Id.* The Government's interests include "the availability of alternative means of investigation, the extent to which the individual contributed to the intrusion, the significance of the offense at issue and the consequences of delaying investigation." *Id.* (citing *Goodwin*, 449 F.3d at 770-71).

Once again, the *Marrocco* court's analysis is instructive. In *Marrocco*, the claimant argued that the officers' detention of his luggage was unreasonable under the circumstances due to "the availability of other means of investigation." *See id.* Specifically, the claimant argued that because he had purchased his train ticket two days before the train's scheduled departure, the officers could have investigated the circumstances of his travel earlier, assessed whether he fit the profile of a drug courier, and arranged for a canine unit to be present at the station upon his arrival. (The implication was that an immediate dog sniff would have prevented the claimant from disembarking and missing his train.) Before rejecting the claimant's argument, the Seventh Circuit extensively considered the claimant's reliance on *Goodwin* and *Place*. *See id.* at 634-35. Ultimately, the court refused to interpret either of those cases as requiring officers to summon a canine unit whenever they have time to do so before a suspect's arrival. *See id.* The court held:

> Rather than setting forth a bright-line rule that a canine unit must be on-hand whenever police have advance notice of a suspected drug courier's arrival, *Place* and *Goodwin* simply recognize that we must assess the reasonableness of a particular seizure by looking to a number of factors that will vary from case to case.

*Id.* at 636. Embracing a "flexible, fact-based approach" to determining the reasonableness of a specific seizure, the court recognized that many factors may affect the availability of a canine unit. *Id.* For instance, the demand for such units may be greater than their availability, and

"officers may have difficulty predicting precisely when and where a canine unit will be required." *Id.* In addition, a dog may not be capable of conducting a drug sniff in an unfamiliar setting such as the interior of a train. *Id.* (citing *Goodwin*, 449 F.3d at 771).

Applying these principles, the Seventh Circuit in *Marrocco* concluded that the officers acted reasonably by removing the luggage from the train to conduct a dog sniff because they did not have sufficient information to justify a dog sniff prior to their conversation with the claimant. *Id.* Before speaking with the claimant, the officers knew only that the circumstances surrounding his travel plans fit the profile of a drug courier. *Id.* However, once they interacted with the claimant and observed his responses and demeanor, the officers formed reasonable suspicion to detain his luggage and order a dog sniff. *Id.* The court concluded that "[g]iven law enforcement's interest in conserving resources and avoiding unnecessary procedures, we do not think that it was unreasonable, in this case, for the officers to refrain from arranging the dog-sniff test until after they had interacted with [the claimant.]" *Id.* Furthermore, the court determined that "the officers acted with reasonable promptness." *Id.* Even though the claimant had purchased his ticket two days prior to the train's scheduled departure, the officers did not learn of his purchase until the day the train was scheduled to depart. *Id.* at 636-37. At that point, the officers investigated further, and once they reasonably suspected the claimant of carrying contraband, they promptly detained his luggage for a dog sniff. *Id.* at 637.

The facts that led to the court's decision in *Marrocco* are present in the instant case as well. Before approaching Simonds, the officers knew only that his travel plans fit the profile of a drug courier. As repeatedly recognized by the Seventh Circuit, the fact that an individual meets the profile of a drug courier does not alone amount to reasonable suspicion. *See Marrocco*, 578 F.3d at 633; *Goodwin*, 449 F.3d at 767; *Sterling*, 909 F.2d at 1083. Agent Evans and Detective

Romano did not form reasonable suspicion until they interacted with Simonds, observed his nervous behavior, and encountered his suspicious responses to their questions. As in *Marrocco*, it was reasonable for the officers to wait until they questioned Simonds before deciding to order a dog-sniff test. *See Marrocco*, 578 F.3d at 636. Moreover, the policy considerations underlying the *Marrocco* court's decision apply equally here. At the suppression hearing, Detective Romano testified that the police do not normally keep a drug-detecting dog at the Amtrak station, and they tend not to use narcotics-detecting dogs until there is a specific arrest. (Tr. 98-100.) As suggested by the court in *Marrocco*, it is likely that the demand for drug-sniffing dogs exceeds their availability. *See Marrocco*, 578 F.3d at 636; *see also Goodwin*, 449 F.3d at 771 ("[A]pparently there aren't enough of these highly trained dogs to have one tethered at every bus station, train station, and airport in Chicago."). Accordingly, the officers' conduct in this case comports with law enforcement's general interest in conserving resources. *See Marrocco*, 578 F.3d at 636.

Finally, the officers acted with reasonable promptness when conducting their investigation. As in *Marrocco*, even though Simonds had purchased his train ticket on May 19, 2003, the day before his scheduled departure, the officers did not learn of his purchase until the morning of May 20, 2003. *See id.* at 636-37. At that point, Agent Evans promptly instituted a search of the DEA's NADDIS database, and, armed with the results of this search, the officers approached and questioned Simonds. Once they reasonably suspected that he was carrying contraband, they immediately detained his bags and summoned a drug-detecting canine to the Amtrak police office. Given the information available to the officers, the promptness of their investigation, and the seriousness of the suspected offense, the officers behaved reasonably by

removing Simonds's luggage from the train and arranging for a dog sniff shortly thereafter.  *See id.* at 637.

While reasonable suspicion permitted the officers to seize Simonds's luggage and remove it from the train, the Court must also consider the constitutional significance of the officers' warrantless search of Simonds's bags after the positive dog alert.  The Government argues that the officers' search of Simonds luggage—the attaché case, in particular—was valid pursuant to the inevitable discovery doctrine.  The Court agrees.  The inevitable discovery doctrine provides that "the exclusionary rule should not be applied when all the steps required to obtain a valid warrant have been taken before the premature search occurs."  *United States v. Elder*, 466 F.3d 1090, 1091 (7th Cir. 2006).  To invoke the inevitable discovery doctrine, the Government must demonstrate that (1) "it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence;" and (2) "it would have conducted a lawful search absent the challenged conduct."  *Marrocco*, 578 F.3d at 637-38.

Under the instant facts, the Government has satisfied its burden.  With respect to the first prong of the inevitable discovery test, the court in *Marrocco* recognized that a positive dog sniff gives rise to an independent, legal justification for conducting a search.  *Id.* at 638.  In this case, the drug dog alerted to the attaché case containing the $40,000.  With respect to the second prong, the Government must show that the officers would have sought a warrant and conducted a lawful search.  *Id.* at 639.  Seventh Circuit "case law establishes that the inevitable discovery rule applies . . . where investigating officers undoubtedly would have followed routine, established steps resulting in the issuance of a warrant."  *Id.*  Given that the officers knew that Simonds fit the profile of a drug courier, he behaved suspiciously when they questioned him, and the dog detected the presence of narcotics in Simonds's luggage, it would be unreasonable to conclude

that they would have failed to seek and obtain a search warrant.  *See id.* at 640.  Accordingly, the Government has satisfied both requirements for invoking the inevitable discovery doctrine.

Alternatively,  if the officers had not developed reasonable suspicion to detain and subject Simonds's bags to a dog sniff, they undoubtedly would have formed an independent justification to search Simonds's luggage once they opened his gym bag and discovered 12 pounds of marijuana inside.  Simonds claims, however, that he never provided the officers consent to search his bags, and without Simonds's consent, the officers' warrantless search violated his Fourth Amendment rights.  *See United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006) ("The Fourth Amendment's probable cause and warrant requirements do not apply . . . where an authorized party voluntarily consents to a search.")  In contrast, both Agent Evans and Detective Romano insist that Simonds consented to their search of his gym bag.  (Tr. 38-40, 80.)  The Court credits the officers' testimony.  While the officers have given the Court no reason to question their testimony, Simonds has presented the Court with many reasons to doubt his credibility.  During the suppression hearing, Simonds admitted that he had initially lied to the officers about the contents of his luggage.  (Tr. 120.)  In addition, despite refusing to answer questions about the source of the $40,000 throughout discovery, at the suppression hearing, Simonds told an entirely incredible story asserting that he had lawfully obtained the $40,000.  The Court finds that Simonds consented to the search of his bag, which led to the officers' discovery of the 12 pounds of marijuana inside of it.

Upon discovering the marijuana, the officers would have had probable cause to arrest Simonds, and they would have been permitted to perform a search incident to his arrest.  *United States  v. Jackson*, 377 F.3d 715, 716 (7th Cir. 2004) ("[I]t is reasonable for the police to search the body, clothing, and immediate possessions of anyone in custody following an arrest on

probable cause.").  Accordingly, if the officers had not formed reasonable suspicion to detain Simonds's luggage before finding the marijuana—and the Court finds that they had—they certainly would have developed an independent basis to search Simonds's luggage once they discovered the marijuana in his gym bag.  In sum, the Court finds that Agent Evans and Detective Romano had reasonable suspicion to detain Simonds's luggage, their detention of his luggage was reasonable under the circumstances, and they inevitably would have discovered the $40,000 in Simonds's attaché case absent their warrantless search.  Therefore, Claimants' motion to suppress is DENIED.

### b.  Motion for Summary Judgment

The Court next considers the Government's motion for summary judgment.  In support of its motion, the Government argues that it has demonstrated a substantial connection between the defendant funds and illegal narcotics activity; therefore, the funds are subject to forfeiture. Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

The Government brings this action pursuant to the civil forfeiture provision of the Controlled Substances Act, 21 U.S.C. § 881(a)(6). This provision subjects to forfeiture "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate [such an exchange]." 21 U.S.C. § 881(a)(6). The defendant funds are therefore subject to forfeiture if they represent the proceeds of an illegal drug transaction or were intended to facilitate such a transaction. Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983(c)(1), the Government must demonstrate by a preponderance of the evidence that the defendant funds are subject to forfeiture. *United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 454 (7th Cir. 2005) (citing 18 U.S.C. § 983(c)(1)). Furthermore, under § 983(c)(3), "[i]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

Here, the "totality of the circumstances" establishes a substantial connection between the defendant funds and illegal narcotics activity. *Funds in the Amount of $30,670.00*, 403 F.3d at

467.  As an initial matter, the Court may properly draw inferences and grant summary judgment on the basis of the significant, documented disparity between Simonds's claimed income and the $40,000 he was carrying in his luggage.  *See id.* at  466.  The funds that Simonds was carrying on May 20, 2003 represent almost double his life savings at that time and nearly four times his annual income.  Simonds admits that, as of that date, he was making roughly $11,000 per year, he had $25,000 in savings, and his expenses included $2,200 in monthly rent plus living expenses for himself and his two sons.  Simonds has not presented any evidence indicating that he legitimately earned the $40,000 he was carrying on May 20, 2003.  Indeed, throughout discovery, Simonds asserted his Fifth Amendment right against self-incrimination and refused to answer any questions about the source and ownership of the $40,000.  The Court is permitted to draw adverse inferences from Simonds's silence.  *See Baxter v. Parmigiano*, 425 U.S. 308, 318 (1976); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) ("The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been widely recognized by the circuit courts of appeals, including our own.")[2]  Ultimately, the notable incongruence between Simonds's income and the $40,000 in his possession, coupled with Simonds's failure to offer any evidence that he obtained the funds legitimately, constitutes powerful evidence supporting forfeiture.

Still, there is additional evidence.  A positive dog alert, which occurred in this case, serves as "strong probative evidence of illegal narcotics activity" supporting summary judgment

---

[2] The Court notes that, at the suppression hearing, Simonds testified that he had legally obtained the funds at issue. He claimed specifically that the funds were a gift from his now-deceased mother.  This was the first time during the course of these proceedings that Simonds either claimed an ownership interest in the funds or attempted to explain their source.  Even if Simonds's incredible explanation were believable, the Court is not entitled to consider Simonds's suppression hearing testimony in resolving this motion due to his assertion of the Fifth Amendment throughout discovery proceedings.  *See United States v. 2001 Mercedes Benz ML 320*, No. 08-C-939, 2009 WL 3334748, at *2 (E.D. Wis. Oct. 14, 2009) (Because the claimant in a forfeiture proceeding "shielded herself from questioning during pretrial discovery, she should not be allowed to offer her own selective and self-serving version of the events in an effort to create a factual dispute after the government has incurred the expense of moving for summary judgment.").

in a forfeiture case. *Funds in the Amount of $30,670*, 403 F.3d at 470. In *United States v. Funds in the Amount of $30,670*, the Seventh Circuit held that a positive dog alert, in conjunction with other factors including the claimant's suspicious travel arrangements and failure to provide a legitimate explanation for the funds, supported the award of summary judgment to the Government. *Id.* at 469. Many of the same factors also exist in this case. In particular, the factors that prompted Agent Evans and Detective Romano to detain Simonds's luggage are also relevant to the forfeiture inquiry. Because these factors were discussed at length in the context of Claimants' motion to suppress, the Court need not revisit them in detail here. To name a few, however, Simonds's suspicious travel arrangements, his nervous behavior and equivocal responses when questioned by the officers, and the officers' discovery of 12 pounds of marijuana in Simonds's possession all establish a substantial connection between the defendant funds and drug trafficking.

In contrast to the Government's overwhelming evidence, Simonds has offered no evidence to defeat the Government's showing that the defendant funds are subject to forfeiture. Despite exceeding the page-limit imposed by this Court's standing order, Simonds's response to the Government's motion for summary judgment never addresses the Government's primary basis for seeking summary judgment: that the defendant funds were used in connection with narcotics trafficking. In the end, the totality of the circumstances point to the inescapable conclusion that Simonds's cash was substantially connected to illegal drug trafficking. Because the Government has proven this connection by a preponderance of the evidence, the defendant funds are forfeitable to the United States, and the Government's motion for summary judgment is GRANTED.

### III. Conclusion

For the foregoing reasons, Claimants' motion to suppress is DENIED, and the Government's motion for summary judgment is GRANTED.

Enter:
/s/ David H. Coar
_____

David H. Coar
United States District Judge

**Dated:** December 13, 2010